J-S11032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SANDRA PENDERGRASS, ADMINISTRATRIX OF THE ESTATE OF VERNETTA MARIE COE, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : | |
| | : : | No. 1022 WDA 2024 |
| AJAX MAGNETHERMIC CORPORATION, ET AL. | : : : | |

Appeal from the Order Entered July 24, 2024
In the Court of Common Pleas of Erie County Civil Division at No(s):  No. 12238 of 2019

BEFORE:  MURRAY, J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: June 24, 2025**

Sandra Pendergrass ("Pendergrass"), administratrix of the estate of Vernetta Marie Coe ("Decedent"), appeals from the orders granting the summary judgment motions filed by Ajax Magnethermic Corporation ("Ajax") and The Electric Materials Company ("TEMCO") (collectively, "Appellees"), in this asbestos action.[1]  We affirm.

---

[1] Subsequent to the filing of the notice of appeal, this Court issued a rule for Pendergrass to show cause why this appeal should not be quashed because claims remained pending against defendant Metropolitan Life Insurance Company ("Metropolitan Life").  **See** Pa.R.A.P. 341(a), (b)(1) (providing that an appeal may be taken from a final order, which is one that "disposes of all claims and of all parties").  Pendergrass thereafter filed: (1) in the trial court, a praecipe to settle and discontinue the matter as to Metropolitan Life; and (2) in this Court, a certified copy of the trial court docket reflecting the filing of the praecipe and Metropolitan Life's dismissal from the case.  This Court then discharged the rule to show cause.

Decedent was diagnosed with mesothelioma in September 2017, and she died from the condition on October 5, 2017. On August 20, 2019, Robert Coe ("Coe"), Decedent's widow and the administrator of Decedent's estate, commenced this action by complaint against Appellees and numerous other defendants, raising negligence, strict liability, and wrongful death claims. Coe died in 2021, and Pendergrass was appointed administratrix of Decedent's estate. Pendergrass filed an amended complaint on January 12, 2022.

In the complaint, Pendergrass alleged that Decedent contracted mesothelioma following her exposure "to asbestos fibers while washing" the work clothes of her father, Victor Zuccolotto ("Zuccolotto"), "from the age of [eight] in 1956 until she moved out of her parents' home in 1968." Trial Court Opinion, 10/31/23, at 1. "During this period, . . . Zuccolotto[] worked at a facility owned and operated by" TEMCO, a manufacturer of electrical equipment. *Id*. at 1-2. "A coreless induction melting furnace produced by Ajax [was] installed in the TEMCO facility in 1962[,] and likely contain[ed] asbestos." *Id*. at 2. It is "unrefuted that the asbestos components of the Ajax furnace were contained within the appliance itself, and thus, were not generally exposed to the open air." *Id*. at 6. "As such, exposure [to asbestos fibers] could only have occurred during the installation in 1962, and thereafter, only during sporadic periods of repair." *Id*.

We summarize the relevant evidence produced during discovery. John W. Cook ("Cook"), Ajax's corporate representative, testified to the following. Ajax shipped its furnaces to customers for the customer to install. ***See***

- 2 -

Pendergrass' Consolidated Response to Appellees' Summary Judgment Motions, 1/19/24, Exhibit 11 ("Cook Dep."), at 94. Ajax often incorporated asbestos containing products, such as asbestos paper or cloth, within the furnace refractory systems to insulate the primary refractory material from the heating source. *See id*. at 58-61, 70-78, 90-93, 120-22. The refractory material itself also sometimes included asbestos. *See id*. at 87-89. Ajax did not design refractory systems to outlive the equipment and therefore they would require replacement after "some period of time," depending on the specific materials used and the furnace's "application." *Id*. at 67, 78, 123. TEMCO produced an equipment record for the Ajax furnace in its facility, which reflected the acquisition of the furnace in 1962, and twelve instances of maintenance of the furnace between 1963 and 1968. *See* Pendergrass' Consolidated Response to Appellees' Summary Judgment Motions, 1/19/24, Exhibit 7 ("Equipment Record"), at 1-2.

Decedent's sister, Mary Jo Goodban ("Goodban"), testified by deposition to the following. Decedent's mother primarily washed Zuccolotto's work clothing. *See* Pendergrass' Consolidated Response to Appellees' Summary Judgment Motions, 1/19/24, Exhibit 18 ("Goodban Dep."), at 49. However, Goodban and Decedent helped with the laundry, primarily during weekends and the summer. *See id*. at 49-50, 68-69. When Decedent assisted with the laundry, she took Zuccolotto's work clothing out of the laundry basket, checked the pockets, and placed the clothing in the washer. *See id*. at 50-51, 66-67. Zuccolotto's work clothes were not "dirty all that much," and there

was no reason for Decedent to shake them out before placing them in the washer. *Id*. at 50.

Zuccolotto's coworker, James Wittman ("Wittman"), testified by deposition to the following. He worked at TEMCO from 1961 to 1969. *See* Pendergrass' Consolidated Response to Appellees' Summary Judgment Motion, 1/19/24, Exhibit 6 ("Wittman Dep."), at 26. Wittman and Zuccolotto worked in the "mold room" at the TEMCO facility. *Id*. at 38, 41-42. Next door to the mold room was the "melt room," which housed six to eight oil-burning furnaces and the electrically powered Ajax furnace. *See id*. at 39-41, 55-56, 77-78. The melt room was one-third of the size of the mold room. *See id*. at 39. Connecting the two rooms were two large doors, between ten and fifteen feet wide, that were always open. *See id*. at 39-41.

Melt room personnel generally performed maintenance on the furnaces on weekends, when Zuccolotto was not working. *See id*. at 79-80, 87-88. The Ajax furnace "was a lot cleaner [of a] mechanism" than the oil-burning furnaces and thus required less maintenance. *Id*. at 78, 88. Additionally, the Ajax furnace saw less use compared to the oil-burning furnaces because it was not as effective at melting the copper used in TEMCO's manufacturing process. *See id*. at 77, 89.

Wittman never saw Zuccolotto in the melt room. *See id*. at 53-55. However, melt room workers entered the mold room multiple times per day and come within six to seven feet of Zuccolotto. *See id*. at 62-63, 94-95.

Zuccolotto wore "street clothes" during his shifts and did not change at the TEMCO facility before or after his shifts. *Id*. at 58-61, 92-93.

Pendergrass also submitted an affidavit and expert report of John M. Dement, Ph.D. ("Dr. Dement"), an industrial hygienist and epidemiologist. *See* Pendergrass' Consolidated Response to Appellees' Summary Judgment Motions, 1/19/24, Exhibit 2. Dr. Dement stated in his report that, due to their small size and "aerodynamic properties," "airborne asbestos fibers can be dispersed over long distances by normal air currents present in industrial settings." *Id*. at 5. Dr. Dement explained:

> This phenomena has been referred to as "fiber drift." . . . The epidemiological literature has shown that persons who are not directly working with asbestos but are working nearby are at significant risk for asbestos related diseases. Such exposures are commonly referred to as "bystander exposures."

*Id*.

At the close of discovery, Appellees filed motions for summary judgment for lack of product identification. On October 31, 2023, the trial court entered an opinion and order granting Appellees' summary judgment motions and dismissing Pendergrass' strict liability claims as to Appellees.[2] As relevant here, the trial court found that Pendergrass did not present sufficient evidence to allow the jury to draw a causal connection between the Ajax furnace and

---

[2] At the April 21, 2023 oral argument on the summary judgment motion, Pendergrass' counsel stated that she did not oppose the summary judgment motions filed by the remaining defendants and consented to their dismissal from the case. On that same date, the trial court entered an order dismissing the remaining defendants — apart from Metropolitan Life — from this case.

J-S11032-25

Decedent's mesothelioma. The court further granted summary judgment as to TEMCO because "there is simply no product to form the basis of a strict liability claim" against TEMCO. Trial Court Opinion, 10/31/23, at 9.[3]

Following the grant of summary judgment as to the strict liability claims, Appellees filed motions for summary judgment as to the remaining claims of negligence and wrongful death. On July 24, 2024, the trial court issued an opinion and order granting these summary judgment motions. The court dismissed the negligence and wrongful death claims for "effectively the same" reason as the strict liability claims: Pendergrass failed to present sufficient evidence to show "that the Ajax furnace was a substantial factor in bringing about the harm" to Decedent. Trial Court Opinion, 7/24/24, at 5.

Pendergrass filed a timely notice of appeal, challenging the trial court's October 31, 2023 and July 24, 2024 summary judgment rulings. Both Pendergrass and the trial court have complied with Pa.R.A.P. 1925.

Pendergrass presents the following issues for our review:

1) Did the trial court err by failing to find that no genuine issue of material fact existed in relation to evidence of record establishing that [Ajax] was both strictly liable and negligent in this matter when a furnace, manufactured by Ajax . . . was installed in the melt room of [the TEMCO] facility in 1962 with

---

[3] The trial court additionally found that Pendergrass did not produce sufficient evidence to survive summary judgment related to: (1) an asbestos slab located in a machine room in the TEMCO facility; and (2) protective clothing worn by melt room workers, that allegedly contained asbestos. *See* Trial Court Opinion, 10/31/23, at 4-5, 8-9. Pendergrass has not raised arguments pertaining to these products in this appeal, and therefore we do not address them in our decision.

> asbestos-containing components thereby exposing . . . Zuccolotto to asbestos fibers while he worked at the plant. . . . Zuccolotto then took said asbestos fibers home on his work clothes and exposed [Decedent] who washed his work clothes from 1956 to 1968 causing her to develop and die from mesothelioma.
>
> 2) Did the trial court err by failing to find that no genuine issue of material fact existed in relation to evidence of record in this matter establishing that [TEMCO] was negligent by allowing . . . Zuccolotto to be exposed to asbestos fibers while working at its plant from a furnace manufactured by Ajax . . . that was installed in the melt room of the facility in 1962 with asbestos-containing components. . . . Zuccolotto then took home his asbestos-laden work clothes and exposed [Decedent] who washed his work clothes from 1956 to 1968 causing her to develop and die from mesothelioma.

Pendergrass' Brief at 14-15.

We first review Pendergrass' argument that the trial court erred by granting Ajax's product identification summary judgment motion and dismissing her strict liability claim against Ajax.[4]  Our standard of review of a trial court's grant of summary judgment is *de novo*, and our scope of review is plenary.  ***See American Southern Insurance Co. v. Halbert***, 203 A.3d 223, 226 (Pa. Super. 2019).

> Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment.  Failure of a nonmoving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.

---

[4] Although Pendergrass also brought a strict liability claim against TEMCO and the trial court granted TEMCO's summary judgment motion on that claim, she has abandoned any challenge to that ruling in this appeal.

*State Farm Mutual Automobile Insurance Co. v. Dooner*, 189 A.3d 479, 482 (Pa. Super. 2018) (citation omitted); *see also* Pa.R.Civ.P. 1035.2(2) (providing that a trial court shall grant summary judgment when, after discovery, "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury").

In reviewing a summary judgment ruling, we view the record in the light most favorable to the non-movant and resolve all doubts as to the existence of a genuine issue of material fact against the movant. *See Criswell v. Atlantic Richfield Co.*, 115 A.3d 906, 909 (Pa. Super. 2015). "An inference of fact that amounts merely to a guess or conjecture, however, is insufficient to defeat summary judgment." *Vivian v. Blank Rome, LLP*, 318 A.3d 890, 899 (Pa. Super. 2024).

We employ the following standard when addressing a product identification summary judgment motion in an asbestos matter:

> In an asbestos case, the plaintiff must present sufficient evidence establishing product identification to survive a summary judgment motion. [*See*] *Eckenrod v. GAF Corp.*, 544 A.2d 50, 52 (Pa. Super. 1988). That is, the plaintiff must establish that the injuries were caused by a product of a particular manufacturer or supplier. In other words, the plaintiff must present some evidence that he inhaled asbestos fibers shed by the specific manufacturer's product. As a result, the plaintiff must do more than just show the mere presence of asbestos in the workplace. Instead, the plaintiff must prove he worked in the vicinity of a specific manufacturer's product.
>
> When evaluating the plaintiff's evidence in asbestos cases at the summary judgment stage, Pennsylvania courts use the "frequency, regularity, and proximity" test established in

*Eckenrod*.  [*See*] *Gregg v. V-J Auto Parts, Co.*, . . . 943 A.2d 216, 227 ([Pa.] 2007).  In *Gregg*, our Supreme Court adopted the *Eckenrod* standard and held that courts should make a reasoned assessment of whether, in light of the evidence on the frequency, regularity, and proximity of a plaintiff's alleged exposure, a jury could draw a sufficient causal connection between the defendant's product and the asserted injury.  *Id*. at . . . 227.  Therefore, the relevant inquiry under a manufacturer's motion for summary judgment is whether a plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant.

*Eckenrod*, however, is not a rigid test that sets an absolute threshold required to support liability.  [*See*] *Gregg*, . . . 943 A.2d at 225. Rather, courts should apply *Eckenrod* in an evaluative fashion, in a way tailored to the facts and circumstances of the case.  Application of the test becomes less stringent where the plaintiff produces specific evidence of exposure to a defendant's product.  Similarly, in cases involving mesothelioma, the frequency and regularity requirements should become less cumbersome.  A plaintiff cannot survive summary judgment, however, if a jury would need to speculate to find in plaintiff's favor.

*Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399-400 (Pa. Super.

2019) (brackets, some quotation marks, and some citations omitted).

As Pendergrass relies on a "fiber drift" theory of dispersal of the asbestos

fibers that Decedent ultimately inhaled, we observe the following:

Of the three *Eckenrod* requirements, regularity, frequency and proximity, the fiber drift theory bears on proximity alone; it sheds no light on how often a particular product was used, nor does it establish how often a particular worker was present in an area into which fibers may have drifted.  It is only when regularity and frequency are established that testimony implicating fiber drift and proximity becomes relevant.

. . . [C]ompetent factually based expert testimony regarding fiber drift may be offered by a plaintiff where it rests on a properly laid foundation showing the frequency with which a defendant's product was used, the area in which it was used and the regularity

of a plaintiff's employment within a zone covered by the reach of fiber drift. While the fiber drift theory may be useful in extending the zone of proximity, it cannot, standing alone, allow a plaintiff to circumvent the other requirements of **Eckenrod**.

***Fiffick v. GAF Corp.***, 603 A.2d 208, 211 (Pa. Super. 1992) (citation omitted).

Pendergrass argues that the trial court erred by dismissing her strict liability claim against Ajax, where she presented evidence linking the asbestos components within the Ajax furnace to the mesothelioma that caused Decedent's death. Pendergrass asserts that there was no dispute that TEMCO installed an Ajax furnace in the melt room in 1962, and that the furnace contained asbestos components, which required replacement during the life of the furnace. Pendergrass observes that the evidence showed Zuccolotto worked in the adjoining mold room from 1962 through 1968, and workers from the melt room entered the mold room multiple times per day.

Pendergrass maintains that "[t]he concept of 'fiber drift' is directly on point" under the present facts:

> It [was] reasonable [for a jury] to infer that the asbestos fibers shed from the asbestos components [during the] installation [and repairs] of the Ajax furnace would have settled on the equipment and workers in the melt room and were then transported just feet away to the mold room, by the melt room workers and hot metal equipment that entered the mold room to within feet of . . . Zuccolotto.

Pendergrass' Brief at 47-48. In light of the testimony that Decedent assisted with Zuccolotto's laundry during the relevant period, Pendergrass asserts a jury could reasonably infer that Decedent inhaled the asbestos fibers as she sorted his work clothes and placed them in the washing machine.

In its opinion supporting the grant of summary judgment on the strict liability claims, the trial court first addressed "the link between Zuccolotto and" Decedent. Trial Court Opinion, 10/31/23, at 3. The court noted that Goodban's testimony was inconsistent as to the frequency with which her sister would assist with Zuccolotto's laundry. However, in light of the fact that mesothelioma can develop from minor exposure to asbestos fibers, the court resolved any doubt as to the frequency and regularity with which Decedent had contact with Zuccolotto's clothing in Pendergrass' favor.

However, the trial court concluded that Pendergrass did not meet her burden of showing "a sufficient causal connection between [Zuccolotto's] work clothes" and the Ajax furnace. *Id*. According to the court, the "weakest link" was Pendergrass' proof as to the exposure of the internal asbestos components of the furnace to open air "during the installation in 1962, and thereafter, only during sporadic periods of repair." *Id*. at 6. The court found that there was "no evidence that Zuccolotto participated in the installation process." *Id*. at 7. Indeed, the court cited Wittman's testimony that he never observed Zuccolotto in the melt room from 1961 onward. The court further found that the "occasional instances of maintenance" between 1962 and 1968 were "not enough to pass muster under the frequency, regularity, and proximity test." *Id*. at 7.

The trial court additionally determined that the fiber drift theory could not establish a causal link between the melt room, where the furnace was located, and the mold room, where Zuccolotto worked. Given the fact that

the mold room was three times the size of the melt room, the court reasoned "it is dubious whether a reasonable jury could draw the inference that any asbestos found on Zuccolotto's work clothes originated from the melt room." *Id*. at 6.  The court explained it could not

> ignore the elements of both physical and temporal attenuation in that Zuccolotto was located some distance away from the melt room in the much larger mold room, and furthermore, that any fiber drift that did occur would have had to originate with the relatively short . . . timespan [when installation and maintenance occurred].  Add to this the fact that any asbestos fibers would then have to make their way to [Decedent] from Zuccolotto's clothing and the causal chain becomes simply too attenuated to support liability.

*Id*. at 7.

After careful review of the record and viewing the evidence in the light most favorable to Pendergrass as the non-moving party, we discern no error by the trial court's grant of Ajax's product identification summary judgment motion.  **See Halbert**, 203 A.3d at 226.  As the trial court ably explained, Pendergrass' claims rely on a multi-step "causal chain between [Decedent's] injury and [Ajax's] product," requiring first Zuccolotto's exposure to asbestos fibers emanating from the Ajax furnace and then Decedent's exposure to those fibers on Zuccolotto's work clothing.  Trial Court Opinion, 10/31/23, at 3. Therefore, "Pendergrass must establish sufficient frequency, regularity, and proximity both as between the [Ajax] product and . . . Zuccolotto, as well as between . . . Zuccolotto and" Decedent.  *Id*.  Here, Pendergrass failed to meet her burden of demonstrating the causal connection between the Ajax furnace

and Decedent's injury. ***See Dooner***, 189 A.3d at 482 (providing where the non-moving party bears the burden of proof as to an issue, her failure to adduce sufficient evidence on the issue establishes the entitlement of the moving party to judgment as a matter of law).

The parties do not dispute that Zuccolotto's exposure only could have occurred during the installation of the Ajax furnace in the melt room and subsequent periods of maintenance through 1968. TEMCO's equipment record establishes that the installation of the furnace occurred sometime between the acquisition of the furnace on October 29, 1962 and the first repair of the furnace in January 1963. ***See*** Equipment Record at 1. However, the evidentiary record is otherwise silent as to the installation process. Pendergrass did not present evidence concerning: the timeframe for the installation; whether the installation occurred during the workday or on weekends or after hours; or whether asbestos-containing components of the furnace required manipulation during installation. Even assuming the installation occurred during normal working hours and the release of asbestos fibers during the installation, the evidence establishes that Zuccolotto worked exclusively in the mold room, which was more than three times the size of the melt room. ***See*** Wittman Dep. at 39, 53-55. Pendergrass presented no evidence showing that Zuccolotto's workstation was close to the doors between the mold and melt rooms, or indeed where in the mold room he worked.

Pendergrass' evidence of asbestos exposure based upon furnace maintenance is even more speculative. While Ajax's corporate representative testified that asbestos materials in refractory systems generally require replacement before the end of the furnace's service life, any claim that such replacement occurred on the furnace here during the relevant period is pure conjecture. *See* Cook Dep. at 67, 78, 123. As noted, TEMCO documented twelve separate repairs to the furnace between the date of installation and the end of 1968. *See* Equipment Record at 1-2. However, none of the entries for the repairs reflect any work on the furnace's asbestos-containing components. *See id*. Furthermore, Wittman, Zuccolotto's coworker, testified that the Ajax furnace was "cleaner" than the oil-burning furnaces, required less maintenance, and saw less use because it was not as effective at melting copper. Wittman Dep. at 77-78, 88-89.

Pendergrass' reliance on the fiber drift theory cannot overcome the deficiencies in her proof with respect to Zuccolotto's workplace exposure to asbestos. While fiber drift can assist in showing exposure where the injured party is not in immediate proximity to the asbestos product, it cannot compensate for the failure to adduce competent evidence regarding the frequency and regularity of Zuccolotto's exposure to asbestos fibers. *See Fiffick*, 603 A.2d at 211 (affirming summary judgment notwithstanding expert testimony that "asbestos fibers drift far from their point of origin after they have been released into the air" where there was no evidence showing

when, where, and how frequently the asbestos-containing product was used nor evidence placing the plaintiff in the vicinity of its use).

Equally unavailing is Pendergrass' claim that melt room workers entering the mold room would have carried asbestos fibers on their person or equipment. Pendergrass presented no evidence that these melt room workers were present during the installation or repair of the Ajax furnace. She also fails to explain what would have caused the asbestos fibers to transfer from the melt room workers to Zuccolotto's clothing when they were in his vicinity. In any event, absent evidence of actual release of asbestos fibers from the furnace, Pendergrass' theories regarding the dispersal of asbestos fibers within the TEMCO facility are mere speculation.

Turning to the final link in the causal chain, the testimony of Decedent's sister established that Decedent helped with the laundry of Zuccolotto's work clothes, albeit only occasionally, such as during weekends and the summer. **See** Goodban Dep. at 49-50, 68-69. In light of the evidence that the release of asbestos only could have occurred during periods of installation and repair, a jury would thus have been required to find that: (1) Decedent laundered Zuccolotto's work clothes during one of these limited periods; (2) asbestos fibers remained on Zuccolotto's clothing until the time Decedent handled them; and (3) Decedent inhaled a sufficient quantity of the fibers to cause her disease. We agree with the trial court that — when considering the improbable chain of events necessary to show Decedent's exposure through the laundering of the work clothing, in conjunction with the earlier noted

deficiencies in Pendergrass' proof as to Zuccolotto's workplace exposure —
"the causal chain becomes simply too attenuated to support [Ajax's] liability."
Trial Court Opinion, 10/31/23, at 7.  While we are mindful that the frequency
and regularity requirements become "less cumbersome" in mesothelioma
cases, Pendergrass has nevertheless not established a sufficient factual
foundation to allow a jury to reasonably infer a connection between Decedent's
injury and the Ajax furnace.  **See Kardos**, 222 A.3d at 400 (citation omitted).
Simply put, Pendergrass relies on inferences that are merely guess and
conjecture, and thus are insufficient to defeat summary judgment.  **See
Vivian**, 318 A.3d at 899.

Accordingly, we conclude that the trial court properly found that
Pendergrass did not produce sufficient evidence to show a genuine issue of
material fact that asbestos from the Ajax furnace caused Decedent's injury.
**See Kardos**, 222 A.3d at 399.  Therefore, no relief is due on Pendergrass'
challenge to the grant of summary judgment in favor of Ajax on the strict
liability claim.

Pendergrass next argues that the trial court erred by granting Appellees'
summary judgment motions as to the negligence and wrongful death claims.
To prevail in a negligence action, a plaintiff must demonstrate the following
four elements:

> (1) a duty or obligation recognized by the law that requires an
> actor to conform his actions to a standard of conduct for the
> protection of others against unreasonable risks; (2) failure on the
> part of the defendant to conform to that standard of conduct, *i.e.*,
> a breach of duty; (3) a reasonably close causal connection

between the breach of duty and the injury sustained; and (4) actual loss or damages that result from the breach.

**Shellenberger v. Kreider Farms**, 288 A.3d 898, 906 (Pa. Super. 2023) (citation omitted).

> To establish a prima facie case of negligence, a plaintiff must produce sufficient facts to show that the defendant's negligence was both the cause-in-fact and the legal, or proximate, cause of her injuries. Factual cause (also referred to as cause-in-fact) is established where it is shown that the plaintiff's injuries would not have occurred "but for" the defendant's alleged conduct.
>
> To establish proximate or legal causation, a plaintiff must adduce evidence to show that the defendant's act was a substantial factor in bringing about the plaintiff's harm. . . .
>
> In an asbestos case, a plaintiff must show that his injuries were proximately caused by the product of a particular manufacturer or supplier, that he inhaled asbestos fibers shed by that product, and that he did so in the workplace. **See Eckenrod**[, 544 A.2d at 53]. For the purposes of proving the causation element of negligence in an asbestos case, it is not enough for a plaintiff to demonstrate that asbestos was merely present — it must be shown that exposure to it was "frequent, regular, and proximate." **See Gregg**[, 943 A.2d at 227].

**Constantine v. Lenox Instrument Co., Inc.**, 325 A.3d 725, 738 (Pa. Super. 2024) (brackets, quotation marks, and some citations omitted).

Pennsylvania's wrongful death statute permits the spouse, children, or parents of a decedent "to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another." 42 Pa.C.S.A. § 8301(a). A wrongful death claim "has as its basis the same tortious act which would have supported the injured party's own cause of action." **Pisano v. Extendicare Homes, Inc.**, 77 A.3d 651, 660 (Pa. Super. 2013) (citation omitted). Therefore, where the underlying cause

of action is premised on a negligence theory, "liability for wrongful death [also] requires a determination that a defendant's negligence caused the death." ***Quinby v. Plumsteadville Family Practice, Inc.***, 907 A.2d 1061, 1077 (Pa. 2006).

Pendergrass argues that she adduced evidence to support each of the elements of a negligence claim, and therefore the trial court erred by granting summary judgment in favor of Appellees. Pendergrass contends that, although Appellees did not have a relationship with Decedent, they nevertheless owed her a duty of care to protect her from exposure to asbestos fibers, as each of the relevant factors weighed in favor of a finding that a duty of care existed. ***See Althaus v. Cohen***, 756 A.2d 1166, 1169 (Pa. 2000) (setting forth five factors that courts must consider when determining whether a duty of care exists in a particular case). Pendergrass asserts that Appellees breached their duty of care "by not protecting . . . Zuccolotto from exposure to asbestos," who "wore his asbestos-laden clothing home . . . and exposed [Decedent] . . . by allowing [her] to wash his asbestos[-]laden clothing." Pendergrass' Brief at 77-78. Pendergrass maintains there was a causal connection between Appellees' conduct and Decedent's injury as it was reasonably foreseeable that the Ajax furnace would release asbestos fibers during installation and maintenance, those fibers would land on Zuccolotto's work clothing, and Zuccolotto would then bring the fibers home and expose Decedent. Lastly, Pendergrass avers that Decedent sustained actual loss as she contracted mesothelioma, which took her life.

The trial court found that summary judgment was appropriate for the negligence and wrongful death claims for "effectively the same" reason as the strict liability claims — Pendergrass failed to produce evidence of the causation element of her claims. Trial Court Opinion, 7/14/24, at 5. Observing that the negligence causation analysis subsumed the "frequency, regularity, and proximity" test, the court reasoned that "because [Pendergrass] has not provided sufficient evidence to satisfy the frequency, regularity, and proximity test, she likewise fails to demonstrate that the Ajax furnace was a substantial factor in bringing about [Decedent's] harm." *Id*.

Upon review, we conclude that the court did not err in granting summary judgment in favor of Appellees and dismissing the negligence and wrongful death claims against them. *See Halbert*, 203 A.3d at 226. As described above, Pendergrass' evidence was insufficient to show frequency, regularity, and proximity of Decedent's exposure to asbestos fibers originating in the Ajax furnace, such that a reasonable jury could draw a sufficient causal connection between the Ajax product — the sole potential source of asbestos exposure in TEMCO's facility — and Decedent's disease. *See Kardos*, 222 A.3d at 399. Because frequent, regular, and proximate exposure is a necessary component of the proximate causation analysis in asbestos negligence claims, she failed to meet her burden with respect to the causation element of those claims, as well as her derivate wrongful death claims. *See Constantine*, 325 A.3d at 738; *see also Quinby*, 907 A.2d at 1077. As we affirm the trial court's conclusion that Pendergrass failed to meet her burden of production as to

causation, we do not address her arguments as to the remaining elements of her negligence and wrongful death claims, including whether Appellees owed a duty of care to Decedent.

For the foregoing reasons, we conclude that the trial court properly granted Appellees' summary judgment motions and dismissed the strict liability, negligence, and wrongful death claims against them. We therefore affirm the court's October 31, 2023 and July 24, 2024 orders.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/24/2025